# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED NEVADA GOLD CORP., et al., | Bankr. No. 15-10503-MFW |
| Reorganized Debtors.¹ | Jointly Administered |
| BRIAN TUTTLE, | |
| Appellant, | Civ. No. 16-058-SLR |
| v. | |
| ALLIED NEVADA GOLD CORP., et al., | |
| Appellees. | |

Brian Tuttle, Sarasota, Florida. Pro Se Appellant.

Michael D. DeBaecke, Esquire, and Stanley Byron Tarr, Esquire, Blank Rome LLP, Wilmington, Delaware. Counsel for Appellees Reorganized Debtors.

Natalie M. Cox, Esquire, United States Department of Justice, Office of the United States Trustee, Wilmington, Delaware, and Robert J. Schneider, Jr., Esquire, United States Department of Justice, Office of the United States Trustee, Newark, New Jersey, Counsel for the United States Trustee.

---

## MEMORANDUM OPINION

Dated: February 10 , 2017
Wilmington, Delaware

---

¹The Reorganized Debtors are: Allied Nevada Gold Corp. (n/k/a Hycroft Mining Corp.); Allied Nevada Gold Holdings LLC; Allied VGH Inc.; Hycroft Resources & Development, Inc.; and Victory Exploration Inc. ANG Central LLC, ANG Cortez LLC, ANG Eureka LLC, ANG North LLC, ANG Northeast LLC, Allied VNC Inc., Hasbrouck Production Company LLC, Victory Gold Inc., and ANG Pony LLC, Debtors in the Chapter 11 cases, were dissolved after the October 22, 2015 effective date. (See D.I. 24 n.1)

ROBINSON, Senior District Judge

## I. INTRODUCTION

Brian Tuttle ("Tuttle"),[2] who appears *pro se*, filed this bankruptcy appeal on

February 1, 2016.[3] (D.I. 1) The appeal arises from two orders entered in the United

States Bankruptcy Court for the District of Delaware ("the bankruptcy court") in *In re*

*Allied Nevada Gold Corp.*, Bankr. No. 15-10503-MFW (Del. Bankr.) ("Bankr. No. 15-

10503-MFW"): (1) the January 20, 2016 omnibus order awarding final allowance of

compensation for services rendered and for reimbursement of expenses (*see* Bankr.

No. 15-10503-MFW at D.I. 1367);[4] and (2) the January 22, 2016 omnibus order denying

shareholder motions (*see id.* at D.I. 1373). Tuttle seeks reversal of the January 22,

2016 omnibus order denying shareholder motions. In addition, Tuttle references his

other appeals and states that the relief he requests in the instant appeal "is nearly

identical" to that sought in the appeals found at Civ. No. 15-946-SLR and Civ. No. 15-

949-SLR, where Tuttle sought reversal of the October 8, 2015 confirmation that

---

[2]Tuttle is a former holder of now canceled common stock of debtor Allied Nevada Gold Corp.

[3]Tuttle filed three other related bankruptcy appeals: on October 19, 2015, October 21, 2015, and February 1, 2016. The appeals in Civ. No. 15-946-SLR and Civ. No. 15-949-SLR were dismissed on September 15, 2016. The decisions are currently on appeal in the United States Court of Appeals for the Third Circuit, No. 16-3745 and No. 16-3746. At the same time, Tuttle filed a notice of appeal in this case even though there was no decision to appeal. The appeal, No. 16-3747, was dismissed by the appellate court for failure to timely prosecute. The appeal in Civ. No. 16-057-SLR was dismissed for failure to comply with the February 4, 2016 order of this court. (*See* Civ. No. 16-057-SLR at D.I.6)

[4]Tuttle did not attach a copy of the January 20, 2016 omnibus order to his notice of appeal and his brief makes no mention or argument regarding the order. The court considers any issues with regard to the order waived. *See Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 202-03 (3d Cir. 2004).

confirmed debtors' amended joint Chapter 11 plan of reorganization.[5] (*See* Bankr. No. 15-10503-MFW at D.I. 1136) The court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a).

## II. BACKGROUND

### A. Chapter 11 and Restructuring Agreement

Reorganized debtors are a U.S.-based gold and silver producer that operates in the State of Nevada. (*See* D.I. 24) On March 10, 2015 ("petition date"), debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the bankruptcy court. As of the petition date, debtors had approximately: (1) $340 million of secured indebtedness in the form of borrowings and issued letters of credit under (a) a secured credit agreement, (b) a term and security deposit loan agreement, (c) capital lease and term loan agreements, (d) swap agreements, and (e) a promissory note; and (2) $350 million of unsecured debt in the form of (a) senior unsecured notes issued pursuant to an indenture, and (b) trade debt. (*See* Bankr. No. 15-10503-MFW at D.I. 16, ¶¶ 12-24)

Prior to the petition date, debtors negotiated the terms of a consensual restructuring transaction with the holders of 100% of debtors' funded secured debt and approximately 67% of debtors' unsecured notes. (*Id*. at D.I. 16, ex. 2) On the petition date, debtors entered into a restructuring support agreement ("RSA"). (*See id.*)

_____

[5]Both appeals were dismissed after the court concluded that relevant factors weighed in favor of dismissal on the grounds of equitable mootness. *See* Civ. No. 15-946-SLR at D.I. 29 and Civ. No. 15-949-SLR at D.I. 35.

On March 19, 2015, the United States Trustee for Region 3 ("U.S. Trustee") appointed a creditors committee in the Chapter 11 case pursuant to Bankruptcy Code § 1102, and on April 10, 2015, appointed a committee of equity security holders, also pursuant to § 1102 of the Bankruptcy Code. (*Id.* at D.I. 95, D.I. 157) The equity committee's membership was reconstituted from time to time subsequent to its formation. (*Id.* at D.I. 371, D.I. 449) The equity committee and creditors committee were dissolved on the October 22, 2015 effective date ("effective date") in accordance with the terms of the amended plan and confirmation order. (*See* Bankr. No. 15-10503-MFW, D.I. 931, at 35, Art. IV, § 4.14)

## B. Sale Order

On March 31, 2015, debtors filed a motion seeking bankruptcy court approval of a proposed sale of certain non-core exploration properties and related assets ("sale assets"), along with related bidding procedures and entry into a stalking horse purchase agreement with Waterton Global Resource Management ("Waterton") that secured a $17.5 million cash bid for the sale assets. (*Id.* at D.I. 133) Debtors' financial advisor, Barak M. Klein ("Klein"), stated that the sale was "in the best interests of debtors and their estates because the debtors were not able to commit the time and capital to effectively monetize the sale assets through their own operations, and the proceeds from the sale would allow debtors to satisfy, in whole or in part, an obligation under the original RSA. (*Id.* at D.I. 133, ex. D at ¶ 12) The bankruptcy court approved the sale motion and entry into the stalking horse purchase agreement and the proposed bidding procedures. (*Id.* at D.I. 606)

## C. Debtors' Plan and Amendments to the Plan

On April 24, 2015, debtors filed a joint Chapter 11 plan of reorganization and disclosure statement. (*Id.* at D.I. 251, 252)  The plan of reorganization proposed a recovery to holders of canceled common stock, contingent on the class of such holders voting in favor of such plan, in the form of warrants that could convert into 10.0% of the new equity in the reorganized debtors. (*Id.* at D.I. 251 at § 2.16)  The equity committee indicated it intended to object to the plan of reorganization's proposed treatment of holders of canceled common stock, and sought discovery related thereto. (*Id.* at D.I. 506 at ¶ 10)  Debtors provided discovery to the equity committee. (*See* D.I. 793, ex. C at ¶¶ 8-12)

Following the filing of the plan of reorganization, debtors' business was negatively affected by numerous factors that severely impeded its mining operations including: (1) high employee turnover; (2) refusal by key vendors to contract with debtors on commercially reasonable terms; (3) gold and silver production levels failing to meet expectations; and (4) continuing decline in gold prices. (*See id.* at ¶¶ 6-7)  On July 8, 2015, debtors commenced a plan to suspend mining operations at their sole revenue-generating mine, the Hycroft Mine, and terminated approximately 230 of the remaining 368 employees. (*See id.* at D.I. 919 at 17-19; D.I. 1100 at ¶¶ 10-12)  According to appellees, due to the plan to suspend mining operations, debtors were unable to comply with several covenants and milestones in the RSA and, as a result, the RSA parties had the right to terminate the RSA. (*See* Civ. No. 15-946-SLR, D.I. 16; Civ. No. 15-949-SLR, D.I. 22 at 9)  Thereafter, debtors negotiated certain amendments

4

to the original RSA ("amended RSA") with the RSA parties and, on August 27, 2015, the bankruptcy court approved debtors' assumption of the amended RSA. (*Id.* at D.I. 926)

On July 23, 2015, debtors filed an amended joint Chapter 11 plan of reorganization and disclosure statement, both of which reflected the agreements reached in the amended RSA. (*Id.* at D.I. 756, 758)  The amended plan of reorganization proposed no recovery to holders of canceled common stock. (*Id.* at D.I. 756 at § 2.14)

### D. Global Settlement

On August 19, 2015, debtors and RSA parties announced they had reached a settlement ("global settlement"), with the remaining major constituencies in the Chapter 11 cases not parties to the amended RSA - the creditors committee and the equity committee. (*Id.* at D.I. 864)  On August 27, 2015, debtors filed a second amended joint Chapter 11 plan of reorganization ("amended plan") and a second amended disclosure statement ("amended disclosure statement") that reflected the global settlement. (*Id.* at D.I. 931, D.I. 933)  The amended plan proposed to provide debtors': (1) secured creditors a distribution in the form of new secured debt in the reorganized debtors ("new first lien term loans"); (2) unsecured creditors the option to receive a cash recovery or to receive privately traded common stock in the reorganized debtors ("new common stock"); and (3) canceled common stock holders a distribution in the form of new warrants. (*Id.* at D.I. 931 at Art. II)  The creditors committee and equity committee supported confirmation of the amended plan. (*Id.*)

5

On August 28, 2015, the bankruptcy court entered the disclosure statement order. (*Id.* at D.I. 940) On September 8, 2015, on behalf of the ad hoc equity committee holders of canceled common stock, Tuttle filed an objection to debtors' notice of hearing with respect to the amended disclosure statement. (*Id.* at D.I. 969)

## E. Examiner Motions

On August 11, 2015, Tuttle filed a motion to appoint an examiner. (*Id.* at D.I. 819) Debtors, the creditors committee, and an ad hoc group of noteholders objected to the motion. (*Id.* at D.I. 957, 958, 960) The equity committee also submitted a response to the motion and stated that it had "analyzed a multitude of potential claims against debtors, debtors' directors and officers, and third parties . . . . weighed its valuation analysis, operational analysis, and analysis of certain potential claims" and, based on its analysis, it "believes that the proposed [amended] plan provides existing equity holders with the best opportunity for a recovery given debtors' current circumstances." (*Id.* at D.I. 961, ¶ 2, 4) Following a September 15, 2015 evidentiary hearing, the bankruptcy court entered an order that denied the motion to appoint an examiner.[6] (*Id.* at D.I. 995, 1021)

## F. Discovery

Tuttle sought discovery from debtors and other parties during the pendency of the Chapter 11 cases. On August 25, 2015, debtors offered Tuttle discovery of more than 3,000 documents that consisted of over 160,000 pages and included 595 native

---

[6]The order denying the first examiner motion was appealed to this court in Civ. No. 15-949-SLR. As discussed in n.3, *supra*, the case is currently pending on appeal before the Third Circuit.

6

files, that had been previously produced to the official committees, on the condition that Tuttle execute a standard confidentiality agreement. (Bankr. No. 15-10503-MFW at D.I. 912) On August 27, 2015, the bankruptcy court approved debtors' proposal and required Tuttle to execute a confidentiality agreement before receiving the documents that had been produced to the official committees. (D.I. 25, ex. 3 at 43-45; Bankr. No. 15-10503-MFW at D.I. 961) On September 24, 2015, Tuttle asked that he be furnished "just the requested" non-disclosure agreements. (Bankr. No. 15-10503-MFW at D.I. 1358, ex. A) Tuttle did not return the executed confidentiality agreement to debtors until October 1, 2015, five days prior to the scheduled October 6, 2015 confirmation hearing.

## G. Confirmation of the Amended Plan

On September 24, 2015, Tuttle and other equity security holders objected to the amended plan on the grounds that the amended plan undervalued debtors and that holders of canceled common stock were entitled to an additional recovery beyond the new warrants. (*Id.* at D.I. 1048, D.I. 1049, D.I. 1114)[7] The confirmation hearing was held on October 6, 2015. Testifying on behalf of debtors were Stephen M. Jones, debtors' chief financial officer ("CFO"), and Klein. (*Id.* at D.I. 1149) Klein testified that the going concern enterprise value of the reorganized debtors, as of October 31, 2015, was in a range between $200 million and $300 million ("Moelis valuation"). (*See id.* at D.I. 1100) The Moelis valuation placed holders of canceled common stock out of the

---

[7]Tuttle's motions are found at D.I. 1049 and D.I. 1114.

money by at least $350 million. (*Id.*) Tuttle cross-examined each of debtors' witnesses. (D.I. 26, ex. 7 at 16-32, 58-66, 70-89, 120-123)

Tuttle objected to the amended plan, but did not proffer any witnesses or offer any competing valuation of debtors at the confirmation hearing. (*Id.* at ex. 7) Tuttle argued that the Moelis valuation was too low and should be increased to enable greater distributions to holders of canceled common stock. (*See id.*) In response to Tuttle's objection to the recovery to holders of canceled common stock, the bankruptcy court explained that "[Tuttle's] representative, the [e]quity [c]ommittee, has already negotiated the terms of the warrant on your behalf." (*Id.* at ex. 7 at 160) Finally, the bankruptcy court overruled Tuttle's oral motion to stay the confirmation hearing that he made at the confirmation hearing. (*Id.* at 124) In entering the confirmation order on October 8, 2015, the bankruptcy court found that the Moelis valuation was "reasonable, persuasive, credible and accurate." (*Id.* at D.I. 1136, ¶ 56)

## H. Amended Plan Implementation

On the October 22, 2015 effective date, the amended plan was consummated, and the reorganized debtors emerged from Chapter 11. (Bankr. No. 15-10503-MFW at D.I. 1190) According to Jones, executive vice president, secretary, and CFO of Hycroft Mining Corp. (f/k/a Allied Nevada Gold Corp.) (as well as CFO of the other reorganized debtors), the consummation of the amended plan triggered the following transactions and events: (1) debtors (i) repaid a portion of certain prepetition debt instruments and other secured obligations, and the DIP facility, (ii) rejected, among other things, certain capital lease obligations, and (iii) eliminated all then existing liens; (2) the reorganized

8

debtors were formed and appointed their boards of directors and adopted new organizational documents; (3) the reorganized debtors dissolved certain prior business entities; (4) pursuant to a new credit agreement, the reorganized debtors incurred $126.7 million of new first lien term loans and have repaid approximately $780,000 of the new first lien term loans pursuant to terms of the credit agreement; (5) the reorganized debtors entered into a new indenture and issued approximately $95 million of new second lien convertible notes, since the effective date have issued an additional $15 million of new second lien convertible notes and, based on lending commitments from existing holders of such notes, the reorganized debtors have called for funding of an additional $5 million of new second lien convertible notes; (6) the reorganized debtors effectuated an interim distribution of new common stock to holders of allowed general unsecured claims entitled to receive such stock under the amended plan, reserved the remainder of such stock for distribution pending further claims reconciliation, entered into a stockholders agreement with the recipients of the new common stock and, to date, at least one shareholder has received the reorganized debtors' approval (as required by the stockholders agreement) to trade the new common stock to a third party; (7) the reorganized debtors issued 100% of the new warrants to holders of the canceled common stock and holders of subordinated securities claims (as defined in the amended plan), and entered into the associated new warrant agreement (as defined in the amended plan); and (8) the reorganized debtors distributed approximately $1.8 million of cash to satisfy (i) allowed Bankruptcy Code § 503(b)(9) claims, and (ii) cure obligations with respect to assumed executory contracts and unexpired leases. (*See* D.I. 24, ex. A at ¶ 3)

9

## I. January 20, 2016 Hearing

On January 20, 2016, the bankruptcy court held an evidentiary hearing and considered numerous shareholder motions that Tuttle had filed from September 24, 2015 through January 4, 2016. (See Bankr. No. 15-10503-MFW at D.I. 1049, 1050, 1110, 1112, 1172, 1173, 1174, 1205, 1206, 1343, 1345, 1346, 1348)[8] All motions were denied. The January 22, 2016 order is the subject of this appeal.[9]

During the hearing, the bankruptcy court considered three motions filed prior to entry of the confirmation, including Tuttle's: (1) September 24, 2015 motion for standing to prosecute equitable subordination claims against the holders of certain of the debtors' senior unsecured notes and the Bank of Nova Scotia (id. at D.I. 1049); (2) September 24, 2015 motion to take depositions of certain RSA Parties upon written questions with respect to the standing motion (id. at 1050); and (3) October 5, 2015 second motion to appoint examiner. The bankruptcy court denied these motions as moot given the entry of the confirmation order and the release of the underlying claims under the amended plan. (D.I. 26, ex. 9 at 68, 69, 71, 88; Bankr. No. 15-10503-MFW at D.I. 1373)

---

[8]The motions at D.I. 1205 and 1206 were filed by Jordan Darga and Stoyan Tachev, respectively, neither of whom are parties to this appeal. (See Bankr. No. 15-10503-MFW at D.I. 1205, 1206)

[9]The omnibus order denying shareholders motions denied two motions filed by Tuttle: (1) an application for reimbursement of his expenses as a purported "party of interest" (id. at D.I. 1112); and (2) a motion to "recognize" the ad hoc committee of equity security holders as an official committee (id. at D.I. 1346). In a stipulation dated May 19, 2016, Tuttle, appellees, and the U.S. Trustee agreed to dismiss with prejudice that portion of the appeal that seeks reversal of the bankruptcy court's ruling on the expense reimbursement motion and the ad hoc committee recognition motion. (D.I. 20) Hence, neither motion (D.I. 1112; D.I. 1346) is subject to this appeal.

With regard to the second motion to appoint an examiner, filed on October 5, 2015, one day prior to the hearing to consider confirmation of the amended plan, it was denied on the grounds that the "second examiner motion is no different from [the] first examiner motion" and confirmation of the amended plan on October 8, 2015 precluded the appointment of an examiner under the Bankruptcy Code. (See D.I. 26, ex. 8 at 76; Bankr. No. 15-10503-MFW at D.I. 1373)

Also considered were motions Tuttle filed after entry of the confirmation order, including Tuttle's October 21, 2015 motions: (1) to stay the confirmation order (Bankr. No. 15-10503-MFW at D.I. 1172); (2) for reconsideration on findings of fact, conclusions of law and order confirming debtors' amended joint Chapter 11 plan of reorganization (id. at D.I. 1173); and (3) to reconsider the bankruptcy court's denial of Tuttle's oral motion to stay (id. at D.I. 1174). The motions were denied. (Id. at D.I. 1373) With regard to the motion for reconsideration of the confirmation order, it (along with related motions filed by other former shareholders) was denied because it did not meet the standard for reconsideration in that it neither presented "new facts" or "new law." (See D.I. 26, ex. 9 at 63-64; Bankr. No. 15-10503-MFW at D.I. 1373)

Finally, the bankruptcy court considered Tuttle's January 4, 2016 motions (also filed after entry of the confirmation order), including: (1) a motion to compel production of documents from debtors (Bankr. No. 15-10503-MFW at D.I. 1343); (2) a motion for an order authorizing Rule 2004 examinations (id. at D.I. 1345); and (3) a motion to compel non-party to produce documents (id. at D.I. 1348). These motions were also denied at the January 20, 2016 hearing. The bankruptcy court noted that the plan had

11

been confirmed and found that "discovery is now moot," "there's nothing pending that the discovery is going to be relevant to", and Tuttle was not "diligent in getting discovery." (D.I. 26, ex. 9 at 75, 100)

## III. STANDARD OF REVIEW

In undertaking a review of the issues on appeal, the district court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the district court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy court's] choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a *de novo* basis bankruptcy court opinions. *See In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup, Inc.,* 281 F.3d 133, 136 (3d Cir. 2002). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Cellnet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless

12

clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witness." Fed. R. Bankr. P. 8013.

## IV. ISSUES RAISED ON APPEAL

Tuttle raises the following issues for review: (See D.I. 21)

(1) Whether the bankruptcy court committed an error of law or an abuse of discretion in denying the motion for reconsideration on findings of fact, conclusions of law and order confirming debtors' amended joint Chapter 11 plan of reorganization.

(2) Whether the bankruptcy court committed an error of law or an abuse of discretion in denying Tuttle's motion for leave of court to take depositions upon written questions.

(3) Whether the bankruptcy court committed an error of law or an abuse of discretion in denying the motion to compel non-party to produce documents.

(4) Whether Tuttle was prejudiced by the bankruptcy court's committing an error of law or abuse of discretion in denying Tuttle's second motion to compel.

(5) Whether the bankruptcy court committed an error of law or abuse of discretion in denying Tuttle's second motion to appoint an examiner with access to and authority to disclose privileged materials.

(6) Whether the bankruptcy court committed an error of law or abuse of discretion in denying the motion for reconsideration on Tuttle's oral motion to stay the proceedings.

## V. DISCUSSION

Appellees argue that the appeal should be dismissed by reason of equitable mootness. They further argue that the appeal is otherwise meritless and should be denied. Tuttle responds that the equitable mootness doctrine is unconstitutional[10] and not applicable.[11] He further contends that the value of appellees' assets has increased substantially since confirmation. Finally, Tuttle contends that "aside from innuendos and conjecture," appellees offer no evidence to support their claim that the relief he seeks has the ability to fatally scramble the amended plan and injure third parties.

"'Equitable mootness' is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief

---

[10]The constitutionality of the equitable mootness doctrine was raised in *In re One2One Commc'ns, LLC*, 805 F.3d 428 (3d Cir. 2015). As stated by the Third Circuit, "[b]ecause we have already approved the doctrine of equitable mootness in *Continental*, only the court sitting en banc would have the authority to reevaluate our prior holding. This court may only decline to follow a prior decision of our court without the necessity of an en banc decision when the prior decision conflicts with a Supreme Court decision." *Id.* at 433 (citations omitted). In *One2One*, appellant argued that equitable mootness jurisprudence should be reevaluated in light of the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011). The Third Circuit stated that *Stern*, alone, did not permit it to depart from *Continental. Id.*

[11]The issues raised by Tuttle challenge rulings made by the bankruptcy court subsequent to entry of the confirmation order. While the court sees no need to address these issues since, as will be discussed, the factors considered by the court favor equitable mootness and dismissal of the appeal, it finds that the bankruptcy court did not abuse its discretion or err in denying Tuttle's motions for reconsideration and other motions that are the subject of this appeal. *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 673 (3d Cir.1999) (court reviews the denial of a motion for reconsideration for abuse of discretion); *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir.1995) (court reviews for abuse of discretion the denial of discovery motions).

14

requested will undermine the finality and reliability of consummated plans of

reorganization." *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015). "The party

seeking to invoke the doctrine (*i.e.*, appellees) bears the burden of overcoming the

strong presumption that appeals from confirmation orders of reorganization plans--even

those not only approved by confirmation but implemented thereafter (called "substantial

consummation" or simply "consummation")--need to be decided." *Id.* at 277-78 (citing

*In re SemCrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013)).

The Third Circuit first recognized the doctrine of equitable mootness in *In re*

*Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc). The majority opinion noted

certain factors to consider "in making a mootness call:"

> Factors that have been considered by courts in determining whether it
> would be equitable or prudential to reach the merits of a bankruptcy
> appeal include (1) whether the reorganization plan has been substantially
> consummated, (2) whether a stay has been obtained, (3) whether the
> relief requested would affect the rights of parties not before the court,
> (4) whether the relief requested would affect the success of the plan, and
> (5) the public policy of affording finality to bankruptcy judgments.

*In re Tribune Media Co.*, 799 F.3d at 278 (quoting *In re Continental Airlines*, 91 F.3d at

560 (citation omitted).

Over the years, Third Circuit precedential opinions have refined the doctrine. As

explained in *Tribune*, "equitable mootness . . . proceed[s] in two analytical steps:

(1) whether a confirmed plan has been substantially consummated; and (2) if so,

whether granting the relief requested in the appeal will (a) fatally scramble the plan

and/or (b) significantly harm third parties who have justifiably relied on plan

confirmation." *In re Tribune* 799 F.3d at 278 (citing *In re SemCrude*, 728 F.3d at 321).

If the confirmed plan has been substantially consummated, the court next determines

whether granting relief will require undoing the plan as opposed to modify it in a manner

that does not cause its collapse. *In re One2One Communications, LLC*, 805 F.3d at

435.

The court concludes that the factors considered weigh in favor of applying the

equitable mootness doctrine. First, the plan has been substantially consummated.

"Substantial consummation" is defined as the:

(A) transfer of all or substantially all of the property proposed by the plan
to be transferred; (B) assumption by the debtor or by the successor to the
debtor under the plan of the business or of the management of all or
substantially all of the property dealt with by the plan; and (C) commence-
ment of distribution under the plan.

11 U.S.C. § 1101(2).

The Jones declaration submitted by appellees states that, as of the October 22,

2015 effective date, a number of transactions and events had occurred, including:

(1) debtors transferred substantially all of their property under the amended plan by

satisfying certain debt instruments and other secured obligations in accordance with the

terms thereof, eliminating all then-existing liens, and dissolving certain business

entities; (2) reorganized debtors succeeded to debtors' assets, appointed new boards

of directors, and adopted new organizational documents; and (3) distributions under the

amended plan commenced. In addition, reorganized debtors have incurred new first

lien term loans, issued new second lien convertible notes and new warrants, have

entered into a stockholders agreement, and distributed a significant amount of the new

common stock to holders of general unsecured claims entitled thereto, and some new

common stock has been sold to a third party. Finally, reorganized debtors have

16

distributed approximately $1.8 million of cash to satisfy allowed Bankruptcy Code § 503(b)(9) claims and to cure payments with respect to assumed executory contracts and unexpired leases.

Finally, no stay has been obtained. Tuttle's oral motion to stay that he made at the confirmation hearing on October 6, 2015 was denied because Tuttle had not yet scheduled a hearing on his second examiner motion. (*See* D.I. 26, ex. 7 at 111, 114-116, 123) Next, on October 21, 2015, one day prior to the October 22, 2015, effective date, Tuttle filed a written motion to stay and a motion for reconsideration of the denial of his oral motion to stay. (*See* Bankr. No. 15-10503-MFW at D.I. 1172, 1174) The motions were discussed at the January 20, 2016 hearing and a written order was entered on January 22, 2016 that denied the motions. (*See* D.I. 26, ex. 9 at 45, 47, 63, 67-69, 90, 106, 107; Bankr. No. 15-10503-MFW at D.I. 1373) During the hearing, the bankruptcy court stated that, "since the plan was confirmed," the motion has to be denied as moot. (D.I. 26, ex. 9 at 72) In addition, a review of the record demonstrates that Tuttle failed to carry his burden with respect to the motion to stay the confirmation order. *See Family Kingdom, Inc., v. EMIF N.J. Ltd. P'ship*, 225 B.R. 65, 69 (Bankr. D.N.J. 1998) (listing factors considered when determining whether to grant a stay).

"The existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness." *In re Grand Union Co.*, 200 B.R. 101, 105 (citing *Continental*, 91 F.3d at 561-63). Indeed, the absence of a stay is so critical to the analysis that even the unsuccessful pursuit of a stay may favor a finding of equitable mootness. *See Continental*, 91 F.3d at 562 ("'[A] stay not sought,

17

and a stay sought and denied, lead equally to the implementation of the plan of reorganization.'") (quoting *Matter of UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994)). Where no stay has been obtained, the reorganization plan goes forward, and it is difficult to undo the acts of third parties proceeding under the plan without prejudicing those third parties. *See generally Continental*, 91 F.3d at 561–63; *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 297 (3d Cir. 1989). Such is the case here.

The amended plan at bar involved intricate transactions, and appellees (who bear the burden to demonstrate that prudential factors weigh in their favor, *see In re Semcrude,* 728 F.3d at 321) submitted the Jones declaration which provides ample evidence that it would be difficult to unravel or retract the amended plan. The amended plan was the result of compromises and agreements that took place over many months among debtors, RSA parties, the creditors committee, and the equity committee. The record as above described reflects that this case involves a sufficiently complex reorganization. *See Continental*, 91 F.3d at 560-61 (reversal of a confirmation order is more likely to lead to an inequitable result "where the reorganization involves intricate transactions or where outside investors have relied on the confirmation of the plan"); *see also Nordhoff Investments, Inc. v Zenith Electronics Corp.*, 258 F.3d 180, 186 (3d Cir. 2001) (finding that plan that involved hundreds of millions of dollars, the issuance of unretractable bonds, and restructuring the debt, assets, and management of a major corporation "could [not] be reversed without great difficulty and inequity").

Tuttle's primary objection is that the value of appellees' assets has increased substantially since confirmation. However, appeals challenging plan valuations on this basis have been rejected under the doctrine of equitable mootness because the proposed relief (*i.e.*, revaluation of the company) would "likely topple the delicate balances and compromises struck by the [p]lan." *In re Genesis Health Ventures, Inc.*, 280 B.R. 339, 346 (D. Del. 2002); *see also Tribune*, 799 F.3d 281 (holding appeal is equitably moot because relief requested would "effectively undermine the [s]ettlement" underlying the plan and, "as a result, recall the entire plan for a redo").

In addition, Tuttle's requested relief would detrimentally affect the rights of numerous third parties not before the court. Equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented." *Continental*, 91 F.3d at 362 (citation omitted). The requested relief would adversely affect third parties that acted in reliance on the amended plan's confirmation, including exit funding lenders as well as recipients of the distributions and issuances of new common stock and new warrants and parties who may have obtained the instruments through trades on the open market. In addition, through required approvals in accordance with the stockholders agreement, there has been one trade of the new common stock to a third party.

Finally, public policy favors dismissal. "The public policy of affording finality to bankruptcy judgments is . . . the lens through which the other equitable mootness factors should be viewed." *Nordhoff*, 258 F.3d at 190. There is a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization" in

19

bankruptcy proceedings. *Continental*, 91 F.3d at 565. "[T]he importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine." *Id.* Given the number of parties involved in the negotiation, approval, and substantial consummation of the amended plan, the court concludes that public policy favors leaving the amended plan undisturbed, Tuttle's objections notwithstanding.

## VI. CONCLUSION

For the above reasons, the court concludes that the relevant factors weigh in favor of dismissing the instant appeal on the grounds of equitable mootness.

An appropriate order shall follow.